In the Matter of the ASSESSMENT OF THE COST AND EXPENSE OF THE LAYING OF SEWERS AND THE RENEWAL OF LATERALS ON STATE STREET BETWEEN CRESCENT PARK AND ERIE BOULEVARD "Authorized and Directed by an Ordinance of the Common Council Adopted on the 5th Day of May, 1925."

Supreme Court, Schenectady County, September 27, 1929.

*Del B. Salmon* and *Burritt B. Johnson*, for the applicants The Masonic Hall Association of Schenectady, N. Y., and others.

*Kelly & Buhrmaster*, for the applicants Knights of Columbus Building Association and others.

*Naylon, Maynard, Bates & Smith*, for the applicants Schenectady Railway Company and others.

*Edwin E. Miller*, for the applicant Schenectady Savings Bank.

*Maurice B. Flinn*, for the applicants D. E. Burbank and others.

*Leary & Fullerton*, for the applicants Ellis Block, Inc., and others.

*Joseph Rosch*, for the applicant The Delaware and Hudson Company.

*Whalen, Murphy, McNamee & Creble*, for the applicant New York Central Railroad Company.

*Carleton H. Lewis*, for the respondent City of Schenectady.

ROGERS, J. The applicants who filed and served objections to the assessment " within the time and in the manner specified by law therefor " are the only parties aggrieved who are entitled to maintain this proceeding. It is a special proceeding, and in order

to maintain it the applicant must bring himself within its provisions by filing objections and by applying to a Special Term of the Supreme Court within twenty days after the confirmation of the assessment.

On July 8, 1929, at the trial, certain aggrieved parties asked to come in and be heard along with the applicants who had filed objections and duly applied for an order of the court vacating the assessment. An order consolidating all of the separate proceedings was made, and the applicants not filing objections were allowed to be heard, subject to a later ruling as to their status in the proceeding. I now hold that they may not maintain the proceeding and their applications are dismissed.

The applicants who filed notices of appeal, as provided by section 71 of the city charter (Laws of 1907, chap. 756), and who cannot maintain this proceeding may possibly pursue that remedy. In *County of Westchester* v. *Common Council of the City of Yonkers* (223 App. Div. 845) it is held: "The remedy provided by section 165 of the Second Class Cities Law is exclusive and precludes the granting of an order of mandamus under the circumstances herein." (Citing *N. Y. C. & H. R. R. R. Co.* v. *City of Yonkers*, 238 N. Y. 165.) Judge CRANE in the latter case states: "The Legislature by this act gave to the plaintiff, respondent, here a full and complete remedy. It knew of the proceedings before the assessors. It has notice of the assessments, and an opportunity to be heard as to their correctness. It could have filed objections as required in both notices given by the common council. Within twenty days after the confirmation of the assessments it could have applied to the Supreme Court to set them aside. * * * The plaintiff, having failed to proceed according to the requirements of this statute cannot now be heard to complain in a court of equity. It had its remedy, quick, efficacious and to the point. It preferred delay and has lost its rights. Procrastination, and not unconstitutional methods, has deprived it of its property."

The Second Class Cities Law was passed in 1906; the Schenectady charter in 1907. In 1909 the Consolidated Laws were enacted incorporating as one of the Consolidated Laws the Second Class Cities Law without substantial change. The Schenectady charter law of 1907 is not included in the schedule of laws repealed when the Consolidated Laws were enacted. In 1909 the Legislature enacted an independent statute regulating the construction of the Consolidated Laws (Laws of 1909, chap. 596). In effect, these statutory rules of construction require the courts to hold that no change in the law has been effected by the Consolidated Laws, the evident purpose of the Legislature being a rearrangement of

such statutes as were in force. In chapter 596 of the Laws of 1909 it is stated: " The true purpose and intent of this act is to prescribe that the statute law of this State, so far as it has been reproduced in such Consolidated Laws * * * and all special laws in force at the time of the enactment of such Consolidated Laws, shall be of the same force and effect as they were before the enactment of such Consolidated Laws." In volume 1 of McKinney's Consolidated Laws, entitled " Statutes and Statutory Construction," section 175 provides: " In accord with the general rule, the provisions of special city or village charters generally remain in force despite subsequent enactments providing a different rule of general application." And in section 176 it is stated: " In other words, a special act of local or particular application repeals an earlier general law, so far as the special act is applicable and the two are in conflict. A repeal of this nature, however, is more in the nature of the creation of an exception to the general rule, than an abrogation of any part of the general law. The general law retains its force, but an exception is made for the particular case." Section 227 of the charter provides: " Nothing contained in this act shall be construed to repeal any statute of the State * * * not inconsistent with the provisions of this act, and the same shall remain in full force and effect, when not inconsistent with the provisions of this act, to be construed and operated in harmony with the provisions of this act." Section 229 of the charter, entitled ". Laws Repealed," provides: " The following acts and parts of acts are hereby repealed: All acts or parts of acts, general or special, in so far as inconsistent with the provisions of this act."

In construing the Schenectady charter, Mr. Justice VAN KIRK, in *Union Paving Co.* v. *Board of Contract* (74 Misc. 646, 648), states: " It thus appears that the provisions of the charter are in full force and effect and control as to all matters covered by them. If there be provisions in the act of 1906, as incorporated in the Consolidated Laws of 1909, not provided for in, or the subject-matter of which is not covered by, the charter, such provisions of the law of 1906 are operative and in force. So far as the provisions of the charter and the provisions of the act of 1906 are not inconsistent,. they are to be construed in harmony, each with the other."

Both the charter and the Second Class Cities Law make provision for the review of assessments for improvements. The provision in the Second Class Cities Law is said, by its terms and by the decisions above referred to, to be exclusive, but, in view of the fact that the charter is in full force and effect and in endeavoring to harmonize the provisions in both statutes relative to the review

of assessments, it should be held that the remedy provided by the Second Class Cities Law is exclusive only where a city charter enacted prior to 1909 fails to provide for special procedure to review an assessment. Those who are entitled to maintain the proceeding under section 165 of the Second Class Cities Law, having made an election of remedies, cannot now pursue the charter procedure, but the applicants, who cannot avail themselves of this proceeding because of their failure to file objections and make timely application to the court, may yet pursue their appeals taken under the provisions of the charter.

In 1925 the common council decided to repave the principal street in the city — State street — from Crescent Park to Erie boulevard. The charter, section 87, provides as follows: " Sewer and water mains in streets to be paved; lateral connections. No ordinance shall be adopted by the common council requiring the paving of carriageway of any street, or any part thereof, with material more expensive than cobblestone pavement, unless the public sewer and water mains are laid therein. If such ordinance shall require the carriageway to be paved with such more expensive pavement, it shall also direct and require that the proper lateral connections shall be made with such sewer and water main, which laterals shall extend beyond the curb line in front of each lot fronting on a part of the carriageway so to be paved. The common council may determine, for the purpose of making such lateral connections, how many feet of frontage shall constitute a lot. The cost and expense of such laterals shall be part of the cost and expense of such improvement and shall be assessed upon the several lots respectively in front of which they shall be laid."

The common council decided that not only sanitary, but also storm water sewers should be laid and the necessary lateral connections made. There are provisions in the charter (§§ 87 and 93) relative to the cost and expense of making lateral connections with the public sewer and water mains and the assessment thereof upon the lots connected, but there is no express provision in the charter authorizing the common council to ordain for the installation of either sanitary or storm water sewers. Such power seems to be implied by section 87, but is not directly stated in the charter. In the enumeration of street improvement in section 44, which the common council may by ordinance provide for, sewers are not included, although the word " drains " is used. The power, however, exists, not only by the general grant of powers given by section 19 of the General City Law (as added by Laws of 1913, chap. 247), but by the grant of specific powers, as contained in subdivision 7 of section 20 of the General City Law (added by

Laws of 1913, chap. 247, as amd. by Laws of 1923, chap. 291, since amd. by Laws of 1927, chap. 221), which reads: "To lay out, establish, construct, maintain, operate, alter and discontinue streets, sewers and drainage systems."

The Home Rule Act (General City Law, art. 2-A, as added by Laws of 1913, chap. 247) undertakes to give to cities enlarged powers in reference to their property and municipal affairs. It is an enabling act. It fills out imperfect grants of powers to cities. It supplements the legislative power of the common council, as recited in section 30 of the Second Class Cities Law.

In ordaining for the sewers it was necessary for the common council to comply with section 100 of the Second Class Cities Law, which reads as follows: "Apportionment of city's expense of improvements. The common council may, by ordinance approved by the board of estimate and apportionment, fix and determine the amount and proportion of the expense which shall be borne by the city at large for opening, altering, grading, curbing or paving a street, or for constructing therein a public sewer which is not less than two feet in diameter. The amount and proportion of the expense of such improvements which shall be borne by the city at large shall be included in the budget and raised by tax the same as other general city charges, or may be borrowed and raised by the city by the issue of bonds in accordance with the provisions of this chapter, as shall be determined by the board of estimate and apportionment. An amount sufficient to pay any such bonds, when due, together with the accrued interest thereon, shall be included in the tax budget and raised by tax the same as other general city charges, and such bonds as they mature, together with the interest thereon, shall be paid out of the moneys so raised by tax. The proportion of the expense which is not borne by the city shall be assessed and charged upon the property affected by such improvement in the form and manner provided by law."

It, therefore, appears that the common council had the power to adopt an ordinance providing for the laying of the sanitary and storm water sewers in question, but there being no inconsistent provision in the charter it was required, in the ordinance, to comply with section 100 of the Second Class Cities Law and could provide for the payment by the city at large for only a sewer over two feet in diameter, and must assess and charge upon the property affected by the sewer improvement the portion of the expense not borne by the city "*in the form and manner provided by law.*"

The power of taxation is in the Legislature. This power may be delegated by the Legislature to cities. Cities have no inherent power to make assessemnts. It is only when the authority is

granted by the Legislature to the city that it may exercise the power. Schenectady received this grant of authority when the Legislature enacted its charter. It is necessary, therefore, that we look to the charter to ascertain what "the form and manner provided by law," mentioned in section 100 of the Second Class Cities Law, is. The form and manner provided by law must be strictly followed in substantial particulars, otherwise the city would be a power unto itself in making assessments. (*Sanders* v. *Downs*, 141 N. Y. 422; *Merritt* v. *Village of Portchester*, 71 id. 309; *People ex rel. Empie* v. *Smith*, 216 id. 95.)

In *Matter of Seidl* v. *Zauner* (247 N. Y. 17) the court held: "The provision in section 282 of the charter of the city of New Rochelle (L. 1910, ch. 559) that notice of a proposed improvement, the expense of which is payable by local assessment, shall be published at least ten days before the time for filing objections, is not substantially complied with by publication of the notice eight days before and such a defect in the publication renders an assessment for the improvement void."

In *People ex rel. Empie* v. *Smith* (216 N. Y. 95) it is held: "The charter of the city of Johnstown prescribes, among other things, for the making of an assessment for a sewer, the establishment by its common council of a district of assessment and the giving notice of the proposed improvement, either by publication or by personal service thereof upon each landowner whose property is in the district affected by the assessment. (§ 130.) A resolution declaring the intention of the common council to make such an assessment was duly adopted, but the notice of the proposed assessment was published before the district of assessment was established. Held, that the method prescribed by the statute for levying such assessment is essential to the validity of the proceeding and must be followed; that the publication of the notice was premature; that the owners of property to be affected by the proposed improvement cannot be ascertained until the district of assessment has been established, and, hence, that the assessment is invalid and must be annulled."

The charter provisions relative to assessment for local improvements are somewhat confusing and ambiguous, but it appears from them with sufficient clarity that the cost of a street improvement is to be borne by the owners of the lands benefited thereby; that the estimated expense of the proposed improvement is to be made; that a district of assessment is to be created; and after notice to the persons interested an assessment is to be made upon the property benefited of the estimated expense of the improvement

and that then the contract for the work may be made. Ascertainment of cost, creation of the assessment district, notice to the persons interested, assessment of the estimated cost must all precede the work of improvement and the letting of the contract therefor. This procedure was not followed. The work was done first and the district of assessment was created and the assessment made afterwards.

The ordinance in question (No. 4982) was adopted May 5, 1925.

Section 1 provided that a storm and sanitary sewer necessary to properly drain State street between Crescent Park and Erie boulevard shall be constructed in advance of the reconstruction of the pavement.

Section 2 directed the board of contract and supply to cause plans and specifications to be made and advertise for bids in accordance with the laws of the city charter.

Section 3 provided that the cost and expense of sewers shall be assessed according to law and the cost of lateral charges shall be assessed separately on property served. Notice was given that the common council would meet May 5, 1925, to consider the ordinance and that all persons interested might be heard. No one appeared and it was approved.

The applicants contend that the common council was without jurisdiction to adopt the ordinance, because it was not initiated by petition and did not contain a district of assessment.

I do not think that a petition was necessary. Section 46 of the charter, relating to the petition to the common council for street improvements, was evidently intended to provide a means, simply, to permit any three or more citizens to incorporate their suggestion for street improvements in the form of a petition.

If a petition were necessary, pursuant to this section, any three members of the common council could have made the same. If required, its absence is not fatal. It is an omission not of sufficient importance to invalidate the assessment. (Second Class Cities Law, § 163.)

Section 85 of the charter requires a petition by abutting owners for pavement improvement, which, apparently, was not made or presented for the State street repaving, but the city at large paid for the paving work, and that is not the question here for decision. If the charter required the presentation of a petition for sewer improvements by a prescribed number of property owners to be assessed for the cost thereof the failure to act upon such a petition would be jurisdictional and render the assessment void.

In *Jex* v. *Mayor* (103 N. Y. 536) it is stated: " The presentation of the proper petition is the basis of the jurisdiction of the common

council to incur the expense for repaving reimbursable by local assessment. The statute requiring the presentation of a petition was designed for the protection of the property owners. The initiation of the improvements without a petition was not an irregularity merely, but was a fundamental error. It was a condition precedent to the right to make an assessment for the improvement, that it should have been petitioned for by the required number of property owners."

The failure, however, to comply with section 45 of the charter in estimating the cost of the work, setting up the district of assessment, giving notice to the persons interested, making the assessment before making or contracting for the improvement, renders the assessment void.

Section 45 of the charter provides: " The expense and cost of all street improvements authorized by the common council, as provided in the preceding section * * * shall be borne by the owners or occupants of the lots or parcels of land benefited thereby; and shall be *apportioned, assessed* and collected according to the provisions herein contained, * * *. No such improvement shall be made or contracted for until the estimated or ascertained expense thereof shall have been apportioned and assessed upon the property benefited thereby."

Section 46 provides for a report of probable cost and expense of any street improvement deemed expedient and for the designation of the district of assessment benefited by such improvement and which should be assessed for the cost and expense thereof.

Section 47 provides for the publication of notice that the common council will consider the matter of such proposed improvement, and that it will hear all persons desiring to be heard upon the matter of said proposed improvement " *or with reference to the district of assessment.*" The section also provides: " The ordinance directing such improvement shall require and direct that the cost and expense thereof shall be defrayed by local assessment, and shall designate that portion of the city which shall be assessed therefor."

Section 93 relates to determination of cost of improvement, apportionment and assessment. The section 52 mentioned in the second line of this section evidently refers to section 44. Section 93 contains the following language: " So much of the aggregate cost and expense of any improvement as shall remain, after deducting therefrom the aggregate cost and expense of all such lateral connections with the public sewer and water main, shall be apportioned and assessed in the manner hereinafter prescribed, upon the various lots and parcels of land contained *in the district of assessment* in

proportion as near as may be to the benefit which each of such lots shall have acquired by such improvement."

Section 94 reads as follows: " Reference of assessors. The common council, after it shall have fixed and determined the aggregate cost and expense of such improvement, and separately the cost and expense of making the lateral connections between each lot and the public sewer and water main, as prescribed in the preceding section, shall thereupon refer the matter to the board of assessors to apportion and assess the amount so fixed and determined as the aggregate cost and expense of such improvement upon the several pieces and parcels of land *within the district of assessment, designated in the said ordinance* in proportion to the benefits derived by such lands and premises respectively from the making of such improvement."

The language " within the district of assessment, designated in the said ordinance " clearly implies that the ordinance authorizing the improvement should contain the district of assessment.

From these provisions it is apparent that the charter procedure is to define the district of assessment before the work is undertaken and to give notice to the taxpayers in the district of assessment of the proposal to make the improvement and afford them an opportunity to be heard as to the correctness of the district to be assessed for the improvement. These provisions in the charter relating to the district of assessment and notice to the taxpayers are for the benefit of the persons who pay the cost of the improvement. To perform the work and create a tax lien without forming a district of assessment, or affording the persons who are to pay the cost any opportunity to be heard, either as to the proposal to do the work, or as to the confines of the district of assessment, would be without due process of law and unconstitutional.

Errors, omissions, irregularities and defects do not void an assessment (Second Class Cities Law, '§ 163; also charter, § 113), but a total want of jurisdiction to levy and assess a tax for a local improvement makes the assessment illegal and void (Second Class Cities Law, § 164). The creation of the district of assessment, notice to the persons to be assessed and the incorporation of the district in the ordinance authorizing the improvement were fundamental and jurisdictional requirements, the absence of which renders the assessment void. The purpose of creating a district of assessment is to enable all persons who may be interested to remonstrate against the proposed improvement. (*Matter of Livingston Street*, 18 Wend. 556; *Hassen* v. *City of Rochester*, 65 N. Y. 516; *Matter of Long Island R. R. Co.* v. *Hylan*, 210 App. Div. 761.)

If the district of assessment had been designated and notice given, as required by the charter, any taxpayer could have appeared before the council and made the contention now urged by the applicants that the sewer should be in the carriageway, and not under the sidewalks, that the expense of placing it under the sidewalks would be much greater and was unjustifiable, that the district of assessment did not include property on Nott terrace and other streets benefited by the storm sewers.

The courts have held in many cases that where the statutory tax procedure regarding the cost of improvements to be assessed upon the abutting property provides for a district of assessment and notice to the persons affected, the failure to prescribe the district and give the notice renders the assessment void. (*Stuart* v. *Palmer*, 74 N. Y. 183; *Remsen* v. *People*, 105 id. 573; *Matter of Union College*, 129 id. 309; *Matter of Seaman* v. *Dickinson*, 1 App. Div. 19; *People ex rel. Spencer* v. *Village of New Rochelle*, 83 Hun, 185; *Weeks* v. *City of Middletown*, 107 App. Div. 587; *Matter of Seidl* v. *Zauner*, 247 N. Y. 17; *Merritt* v. *Village of Portchester*, 71 id. 309; *Miller* v. *City of Amsterdam*, 149 id. 288.)

The railroad company applicants, the New York Central Railroad Company and the Delaware and Hudson Company, make the further objection that the assessment against their properties, used exclusively and permanently for right-of-way purposes, is void. Their rights-of-way are abutting and cross State street at approximately right angles, and their tracks are carried by an overhead bridge. On the north side of State street under the overhead crossing the New York Central has two stores fronting on the north side of the street. On the south side the New York Central's property is put to no other use than for right-of-way purposes. Back of the south abutment of the overhead bridge the railroad company has an embankment which supports its ballast, ties and rails. Four main line tracks and one track leading into the railroad yard to the east or south are located upon this land. The New York Central makes no objection to the assessment of its right-of-way on the north side, but insists that the frontage assessment against its right-of-way plot 130 by 132 feet on the south side is void, not only because it is used exclusively and permanently for right-of-way purposes, but also because the assessment includes items for the reconstruction and repair of sidewalks. Only a small portion of the sidewalk was renewed, and the railroad company claims that under section 93 of the Railroad Law it is the duty of the city to keep the subway and its approaches, including sidewalks, in repair.

The Delaware and Hudson Company is assessed for twenty-

three and thirty-six one-hundredths feet on the south side of State street under the railroad viaduct, and twenty-three and thirty-four one-hundredths feet on the north side of State street under the railroad viaduct. With the exception of nine and sixty-six one-hundredths feet used as an alleyway to the east of the viaduct on the south side of State street, it was stipulated that the property assessed is used entirely for right-of-way purposes. The Delaware and Hudson Company has no stores or other rent-producing improvements upon its right-of-way at this point.

The rule as to the assessment of railroad rights-of-way for abutting street improvements is that railroad rights-of-way are exempted only where so used that they give evidence of a permanent user for railroad purposes.

In *N. Y. C. & H. R. R. R. Co.* v. *City of Yonkers* (238 N. Y. 165, at p. 172) Judge CRANE states: " It is not all property of a railroad company that is exempt from assessment for local improvements. We have held (*Matter of City of New York [Juniper Avenue]*, 233 N. Y. 387) that although property may be used by the railroad for railroad purposes, nevertheless, it may be subject to assessment for local improvements if it appears that the property may not always be used for railroad purposes, but may be increased in value by the improvement."

In the *Juniper Avenue Case* (233 N. Y. 387) it is said: " Not because the owner is a railroad corporation was the rule adopted; not because the land is devoted to a public use, but because the public use to which it is devoted is in all probability permanent and is inconsistent with the idea of any benefit from such an improvement as we are here considering."

It has been said that an assessment for a sewer might properly be imposed upon a railroad right-of-way. (*Troy & Lansingburgh R. R. Co.* v. *Kane*, 9 Hun, 506; affd., on other grounds, 72 N. Y. 614.)

It is contended by the corporation counsel that, because on the bridge structure there are gutters and drains carrying the rain water to the street, the sewers are efficacious in taking the water from the drain pipes. The assessment, however, is not against the bridge structure which, certainly, is used solely for right of way purposes, but is against the lands on the north and south sides of the street. It is contended that as to these lands the sewer facilities in the adjoining street are, or at some time may be, useful. The city also claims that the use of the New York Central right-of-way property on the north side of the street for store purposes evidences the fact that the property on both sides of the street is available for that purpose, and might be so used if the railroad company desired to erect stores beneath the bridge

superstructure. It seems to me that the question whether the rights-of-way are benefited by the sewer improvement is a question for the assessors to determine when before them, after notice and an opportunity for a hearing is given the railroad companies.

It is said by Judge CRANE in *N. Y. C. & H. R. R. R. Co.* v. *Yonkers* (*supra*): " There is no statute which exempts the property of a railroad company from assessment for local improvement. Its yards, terminals or storage plants may be greatly enhanced in value by local improvements. It is only where the railroad's right-of-way is so used that it gives evidence of a permanent user for railroad purposes that we have held the railroad cannot be assessed. These were facts for the assessors to determine. The railroad company should have appeared before the assessors and presented the facts and then, if dissatisfied appealed according to law from the adverse determination."

The railroad companies have been deprived of an opportunity to be heard, both on the question whether their right-of-way properties, or portions thereof, should be included in the district of assessment, and as to whether items for sidewalk improvements should be assessed against them in view of the city's statutory duty to maintain the walks beneath the overhead bridge.

It is the intent of the Legislature where assessments have been declared void that the same may be reassessed in a proper manner. Section 165 of the Second Class Cities Law, at the end thereof, states: " In case of the failure of any assessment or tax for any cause, the comptroller shall certify such fact to the common council, and it shall be its duty to forthwith cause the same to be relievd and reassessed in a proper manner."

The charter (§ 114), entitled " Vacating illegal assessments; reassessments," is as follows: " Whenever it shall be deemed by the common council, or be determined by the judgment of a court of competent jurisdiction, that any assessment authorized by this title is illegal or void for want of jurisdiction, or for any other cause, the common council may pass an ordinance designating the work so made or done, the whole expense thereof, and the part or portion of the city deemed to be benefited thereby, or equitably chargeable with the costs and expense thereof, and may assess the several lots or parcels of land in the territory so designated in said ordinance, according to the benefits received in the proportion in which they are equitably chargeable therefor; and the same proceedings shall be had for the enforcement and collection of such assessment, as in case of other assessments which are properly made in the first instance. In case of a reassessment under the provisions of this section, the common council shall cause a notice to be published

in the official newspaper for at least five days that it has made such reassessment, and that it will meet at a time and place to be stated therein, to review the same, and that all persons interested therein, who shall then appear and desire to be heard, will be heard in relation thereto. At the time and place so stated, or at such other time to which the matter may be adjourned by a majority of all the members of the common council, then and there appearing, the common council, after hearing all persons interested who may desire to be heard, shall review and confirm or modify the reassessment so made by it. The said assessment, so confirmed or modified, shall be entered at length in the minutes of the common council, and shall be final and conclusive, and may be enforced and collected in the manner provided hereinbefore for the enforcement and collection of assessments for local improvements. Whenever any money shall have been paid upon an assessment, and a reassessment shall have been made, in pursuance of this section, the amount so paid shall be credited on such reassessment to the property for and on account of which such payment was made, and in case of any alteration in the respective amounts of the original assessment by such reassessment, whereby the amount so paid shall exceed the amount reassessed on the same property, the surplus shall be paid by the city to the person who paid the same, or to his legal representatives or assigns, and in case the amount so paid shall be insufficient to pay the amount so reassessed, the deficiency only shall be collected under such reassessment, in the same manner as other assessments."

The question of the constitutionality of these provisions suggests itself. A tax lien may not be created without due process of law. A person called upon to pay for a local improvement must be given an opportunity to be heard, where it appears that his interests might otherwise be prejudiced.

In *New York Central & Hudson River R. R. Co.* v. *City of Rochester* (129 App. Div. 805; affd., 198 N. Y. 570) it is said: " It seems to be settled by the courts of this state and the United States that the legislature has the power to determine that a public improvement should be made, and the amount to be raised to pay the expenses of making the same, and the territory to be benefited thereby and the classes of persons and property to be assessed therefor, and the amount to be assessed to each class. It may be committed to commissioners or assessors to determine any or all of these things in any given case, but the legislature is not bound to so commit them. It may determine them for itself, and having done so, its action is not open to review by the courts. It cannot be shown to be even mistakenly unjust. When th-

determination of these things is committed to commissioners or assessors, notice is required to be given to the parties interested, and a hearing had before them before the determination is made."

The reason why the assessment we are considering is void is because the common council did not observe the statutory provisions. It had no power to assess except as given by statute. But the Legislature has said, in section 165 of the Second Class Cities Law and section 114 of the charter, that the common council, having made a failure to legally assess for the improvement, may yet proceed upon equitable principles to make the assessment.

" The validity of reassessment statutes has been very generally upheld and the statutes declared constitutional. The Supreme Court of the United States has held that statutes of this character violate no provision of the federal constitution; and state courts have held that the statutes are not objectionable as authorizing the taking of property without due process of law in contravention of the prohibition contained in the state and federal constitutions, or as abridging the privileges and immunities of citizens of United States, or as imposing a private tax, or as constituting special or class legislation, or as being in conflict with the judicial power of the government. Nor do they violate contract rights since special assessments for local improvements are not based on the principle of contract and create no contractual relations between the city and the property owners." (44 Corpus Juris, 771; *Tifft* v. *City of Buffalo*, 82 N. Y. 204.)

In enacting the Schenectady charter the Legislature could have omitted some of the requirements, the failure to observe which make the assessment in question invalid. Whatever the Legislature could have provided in the charter in the first instance, as a method of assessment, it may do by means of a reassessment statute. Reassessment statutes for local improvements are based upon the principle that the property to be assessed has been benefited by the improvement, and, therefore, if notice is given and opportunity for a hearing is furnished as to the benefits that have accrued to their property and as to the district of assessment, the owners of the property benefited are equitably chargeable with the cost of the improvement.

" The taxing power, in all its plenitude, resides in the legislature. In the exercise of that power it may undoubtedly impose upon property in a locality an assessment for the expense of a local improvement, either by its own direct action or through the medium of local authorities. This power may be lawfully exercised without the consent of the property owners. All that is necessary is that, at some stage of the proceeding, they shall have an oppor-

tunity to be heard. When the law recognizes that right their consent to the making of the improvement is unimportant." (*Jones* v. *Town of Tonawanda*, 158 N. Y. 438, 449.)

It seems right that there should be some provision of law permitting the collection from the property owners benefited by an improvement of the amount equitably due from them. The blunder of the city officials should not place the burden of this improvement upon the city taxpayers at large where, admittedly, the pavement of State street and enlarged sewers were necessary, and the installation of the sewers was not only required by the charter before the paving was laid, but good judgment and common sense dictated they should be laid before the paving work was done. No claim is made of any fraud. No claim is made that sewers, both sanitary and storm, were not necessary. No claim is made that the abutting property has not been improved and enhanced in value thereby. It would seem, therefore, that, if possible, the owners of the property benefited should pay such amount of the cost as is equitably due from them.

To now reassess the full cost of the improvement against the abutting property would deprive the owners thereof of the opportunity, which was their right under the statute, to be heard as to whether the sewers should be laid under the sidewalk, involving an extra expense claimed by applicants to be $90,000, or in the roadway beneath the pavement. To-day their objection in that respect would be of no avail. If they had been afforded the right to object, they might have persuaded the common council to place the sewers in the roadway and save themselves the extra cost. It would seem inequitable, therefore, to reassess the full amount, including this extra cost, against them, and might be considered as taking their property without due process of law. If, however, the extra cost of placing the sewers beneath the sidewalk is omitted from the assessment, I can see no injury the taxpayers sustain, assuming that the sewer improvement was necessary, and assuming that the district of assessment is coextensive with the property benefited. By section 114 the common council is required to make the assessment against " the part or portion of the city deemed to be benefited thereby." Therefore, the question of whether the district of assessment created by the board of assessors in 1928 includes all of the benefited property would be open for a decision after a hearing. The railroad companies could be heard as to whether their rights-of-way should be included in the district to be assessed.

In the event that there is a reassessment, the last sentence of section 114 of the charter takes care of the persons who have paid

their taxes for this improvement without protest. They could be rebated the overpayment. The assessment was against ninety-nine separate parcels. About twenty applicants are entitled to maintain this proceeding under section 165 of the Second Class Cities Law. A few others may be entitled to prosecute appeals pursuant to section 71 of the charter. The great majority of the taxpayers, apparently, paid the amount assessed against them without protest.

On a reassessment hearing the persons interested could be heard on the question whether the storm sewer was unnecessarily large, and, therefore, more expensive than necessary to take care of the storm waters of said street. The contention that it was built larger than necessary in anticipation of the abandonment of the Cowhorn creek drainage could be heard by the common council. I think, however, that the common council's decision on that question would not be subject to review. It was the duty of the common council, in providing for new sewers, to take care of not only the present and immediate future needs, but to provide a system of sewers that would be adequate for some years to come; and just how far, in its sound judgment and discretion, it determined to go in that respect would not be a question for court review, unless there was a very grave abuse of discretion and apparent lack of anything to support its judgment in the matter.

An order should be made determining the assessment void as against the applicants entitled to maintain this proceeding, with costs and disbursements to each applicant, except applicants appearing by the same attorney are together allowed one bill of costs. Submit order.